Filed 11/30/23  In re A.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.B.,<br><br>Defendant and Appellant. | F086452<br><br>(Super. Ct. No. 13CEJ300087-2)<br><br>**OPINION** |

## THE COURT*

APPEAL from an order of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Brian C. Bitker, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Levy, Acting P. J., Smith, J. and Snauffer, J.

Appellant T.B. (mother) is the mother of A.C., who is the subject of this dependency case. Mother challenges the decision of the juvenile court to terminate her parental rights following a contested hearing addressing the permanency plan for A.C., submitted by the Fresno County Department of Social Services (department) under Welfare and Institutions Code[1] section 366.26. Mother contends the court's refusal to approve and fund the preparation of a bonding study calls into question the court's conclusion the beneficial parent-child relationship exception did not apply in this case. We affirm the decisions of the court terminating mother's parental rights and denying mother's request for the preparation of a bonding study.

## PROCEDURAL AND FACTUAL SUMMARY

On March 9, 2022, the department filed a petition alleging A.C. came within the jurisdiction of section 300, subdivision (b)(1) because of mother's history of substance abuse. The petition further alleged section 300, subdivision (j) also applied because mother had previously failed to reunify with A.C.'s sibling C.B., who was removed from mother's care in 2013 and placed into long-term foster care in 2015, due to similar substance abuse issues.[2]

The petition resulted after the department received a referral on March 6, 2022, alleging general neglect of A.C. The referring party indicated mother appeared to be under the influence and was homeless, sleeping on the floor of an aunt's house with A.C. The day before the referral was made, local police conducted a child welfare check after which mother agreed to a safety plan leaving A.C. in the custody of her aunt while mother slept in a car in front of the house. However, after it was reported mother was

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     This petition was amended on March 14, 2022, to correct an error but not the substance of the allegations.

difficult to reach because she had disabled her cell phone, the aunt requested A.C. be placed in the custody of the referring party.[3]

The resulting detention report detailed interviews with the aunt and A.C.'s former foster father. These individuals expressed concern about mother's recent change in behavior and possible drug use. On March 7, 2022, mother agreed to take a drug test, however, she did not follow through with the test on that day. After mother took the drug test the following day, it was discovered she had methamphetamine in her system. A.C. was taken out of mother's custody on March 9, 2022, and placed with a foster family.[4] The record shows mother visited with A.C. on a weekly basis through the department.

At the end of a jurisdictional hearing held on May 16, 2022, the juvenile court found A.C. was a minor coming within the description of section 300, subdivisions (b)(1) and (j). A disposition hearing was then continued to August 15, 2022. At the August 15 hearing, the court declared A.C. a dependent and removed her from her mother's care and custody. Mother was not offered reunification services pursuant to section 361.5, subdivision (b)(10), and instead the court set a section 366.26 hearing for December 7, 2022. This meant reunification was no longer possible unless changed circumstances could be established, and that a more permanent plan would now have to be prepared for A.C.'s placement.

On August 23, 2022, mother filed notice of her intent to file a statutory writ petition. Mother's notice of intent, however, was not filed in a timely manner, and on October 5, 2022, this court dismissed mother's petition as abandoned after mother failed to establish "extraordinary good cause" to permit a late filing.

---

**3** While there is no real clarification in the record, the referring party appears to be A.C.'s foster father, J.L.

**4** This placement was in the same foster home A.C. had been placed in following an earlier dependency petition process when she was 18 months old.

3

A.C. reportedly bonded to her foster parents and referred to them as " 'momma' " and " 'daddy,' " and her foster parents reported that they loved A.C. as if she were their own child and "would like to provide her a permanent plan of adoption." While A.C. was physically healthy and meeting developmental milestones, she was receiving mental health services because "she was experiencing sadness, emotional dysregulation, tantrum behaviors and poor interactions with peers[,] all impacting her functioning." Specifically, A.C.'s foster parents reported she was displaying separation anxiety when leaving for day care. They also reported that A.C. had difficulty potty training, was hoarding food, and was fighting going to sleep at night because she was frightened of " 'monsters.' " The foster parents reported these behaviors increased after visits with mother.

Sometime after the August 15, 2022 hearing, A.C. and mother participated in video visits because mother was enrolled in a drug program. The foster parents described these visits as " 'hit or miss,' " as A.C. seemed to be triggered by them, explaining A.C. would have bedwetting incidents "without fail" following these visits. Mother and A.C. had an in-person visit on September 23, 2022. When A.C. arrived, she greeted her mother and then pointed to her foster father and asked, " 'Mom is this is my dad[?]' " Later in that visit, A.C. said, " '[T.], I'm so glad you're here today.' " Mother responded by saying, " 'I'm mommy, please don't call me by my name babe.' "

In the section 366.26 report prepared by the department, there was an acknowledgment mother had visited A.C. consistently, that the visits were generally positive, and that A.C. "appears happy before visitation and the transition to the visitation room and does well with the transition after the visit .…" The department further acknowledged that A.C. still referred to mother as " 'momma' " and that the interactions between mother and A.C. were often positive. However, the department ultimately did not believe severing the relationship between mother and A.C. would be detrimental because "only two hours out of [A.C.'s] month are dedicated to a visit with [mother]."

4

### 1. *The Request for a Bonding Study*

Again, in preparation for the section 366.26 hearing, the department recommended the juvenile court terminate parental rights so that a permanent plan of adoption could be implemented for A.C. At the section 366.26 hearing held on December 7, 2022, mother's attorney requested a contested hearing, which was set for February 22, 2023. In addition, her attorney stated, "[m]other is requesting to contest this under the grounds of bond— bonding, and plans on requesting a bonding expert."[5] Thereafter, in a brief submitted to the court on February 15, 2023, in preparation for the contested hearing, mother listed a bonding expert as a possible witness.

On February 10, 2023, mother submitted an ex parte application seeking authorization to release information, pursuant to section 827, for the preparation of a bonding study. On the same day, mother submitted a second ex parte application requesting funding for a bonding expert pursuant to sections 218 and 317. Both requests were denied by the juvenile court on February 14, 2023, for lacking a memorandum of points and authorities.

On February 22, 2023, the date set for the contested section 366.26 hearing, mother made a request through her attorney for a continuance so that a bonding study could be completed. The juvenile court concluded it was not prepared to move forward with the contested hearing and continued the hearing to April 17, 2023, to assess the request for a bonding study.

On March 20, 2023, during a settlement conference held prior to the contested section 366.26 hearing, the juvenile court stated it had considered mother's request for a bonding study and was denying that request pursuant to Evidence Code section 352. The

---

**5**    During the hearing, the court noted that a bonding study may have been requested on behalf of mother during the August 15, 2022, dispositional hearing. We have not been provided a copy of a transcript for that hearing and cannot verify the accuracy of the statement by the court at this time.

court expressed its belief that the department had done an "adequate job describing in detail the bond between the mother and the minor in this case[.]"  In addition, the court noted that "evidence prepared by an expert would take a considerable amount of time, as that bonding study [had] not even been done yet" and "would prolong the [c]ourt coming to some decision about a permanent plan for the minor in this case."  The court clarified its ruling, stating mother was not prevented from presenting evidence on bonding during the contested hearing, but that there would be no continuance of the matter to allow an expert to observe the interactions between mother and A.C., especially because the court already had the social worker's observations to consider.

On April 13, 2023, mother filed a request pursuant to section 827, seeking permission to release the social worker's reports to a bonding expert prior to the contested hearing.[6]  The juvenile court granted mother's section 827 request on April 27, 2023.

### 2.    *The Section 388 Petition*

On May 19, 2023, mother filed a petition pursuant to section 388 requesting she be provided with reunification services.  In support of this petition, mother provided documentation she had earned a one-year sobriety chip in a 12-step program, completed a residential drug treatment program, and had been receiving mental health treatment since January 2023.

On May 22, 2023, the date set for the contested hearing on the 366.26 petition, the juvenile court noted mother's petition demonstrated only changing, but not changed, circumstances.  However, the court went on to state it would permit mother to present additional evidence and continued the matter for a contested hearing to May 26, 2023,

---

[6]    The contested hearing originally set for April 17, 2023, had to be continued due to the unavailability of mother's guardian ad litem.  The new date for the contested hearing was now May 22, 2023.

which would now coincide with the contested section 366.26 hearing, which was also continued "due to lateness of day."

### 3. *The May 26 Contested Hearing on Both Matters*

Both the contested section 366.26 hearing and the hearing on mother's section 388 petition took place on May 26, 2023, and June 2, 2023. The juvenile court first addressed the section 388 petition and took testimony from mother. Mother testified she no longer had a drug problem, was attending 12-step meetings daily, working with a sponsor, and living in a halfway house. While the court commended mother on her progress, it concluded mother continued to minimize the issues that brought A.C. before the court, indicating mother's circumstances were changing, not changed, citing family issues and mental health concerns.

The juvenile court then turned its attention to the contested hearing for the section 366.26 permanency plan. Maribel Castellanos, the department social worker assigned to A.C.'s case, started her testimony by addressing her education and areas of study. Castellanos stated she had been assigned A.C.'s case in September 2022, and had personally observed six visits between mother and A.C. Castellanos also noted she had reviewed the visitation logs for the visits that occurred before she was assigned the case. Castellanos characterized mother's visits with A.C. as "very playful" and described their interactions between periods of play. In Castellanos' opinion, mother had difficulty focusing on the visits and would sometimes start conversing with her instead of focusing on A.C. When asked about A.C.'s relationship with her foster parents, Castellanos testified that A.C. viewed them as her parents and referred to them as "mama and daddy."

Castellanos' testimony also addressed her belief that A.C. would regress in certain developmental ways after visiting her mother. While Castellanos believed mother and A.C. had a "friendly" relationship, she did not believe the two had a positive relationship "because of the kind of behaviors we see after the visits." Castellanos concluded, "[A.C.]

7

would be okay if the parental rights were terminated." Castellanos also explained she did not believe A.C. had a secure attachment to her mother, which required "safety, protection provided by the parent, or a caregiver."

A.C.'s foster father, J.L., also testified, offering his conclusion that adoption was in A.C.'s best interest because, in his opinion, mother was still unstable and therefore unable to provide A.C. with the stability she needed. J.L. described an incident when mother stated she would kill herself if A.C. were adopted.

Before ruling, the juvenile court noted it considered all the testimony offered, as well as the over 140 pages of "logs and reports." The court initially stated it could not conclusively connect A.C.'s behavioral issues to her interactions with her mother. When considering the possible termination of parental rights, the court then stated:

> "As I sit here today I have to follow the law with the prongs that were stated by counsel and not consider anything besides because most things were stipulated to. I don't know if the regular visitation and contact was stipulated to, but I will find that there was regular visitation and contact and that it is perfectly understandable that in the midst of these proceedings that it can be confusing. The schedule was changed a bunch of times of the visitation and I do not fault mother for missing those last couple of visits nor do I fault her for a lot of things that were pointed at her in the chronos.

> "Prong two, a relationship; the continuation of which would benefit the child. The child has a substantial positive emotional attachment to parent. The kind of attachment that implies that a child would benefit from continuing the relationship. I agree that [A.C.] would benefit from continuing the relationship with her mother; she's five years old. Like [mother's attorney] said[,] she knows who her mother is."

After discussing various concerns raised by mother's attorney, the court returned to its consideration of the relevant test:

> "I believe that this [c]ourt is allowed and should consider the stability of the mother when deciding if the risk—excuse me, if the detriment of severing the relationship outweighs the benefit of adoption because I believe if a [c]ourt is saying that the relationship is so important that I should not terminate parental rights I think the flip side of that is that if there is

8

instability in that relationship and [A.C.] is harmed by that instability later when I don't terminate parental rights that I can consider stability as a factor on whether or not [A.C.] is going to be harmed or whether the detriment of severing the relationship outweighs the benefit of adoption, I think that's the flip side."

The court concluded that clear and convincing evidence supported the recommendation A.C. would be adopted, and that adoption was the appropriate permanent plan for A.C. Parental rights were then terminated.

## **DISCUSSION**

The focus of mother's challenge in this appeal asks whether the evidence before the juvenile court supported the termination of her parental rights without the benefit of a bonding study, which could have illuminated whether the beneficial parent-child relationship exception applied in this case.

## I.    **Evaluating Mother's Request for a Bonding Study**

Mother contends the juvenile court failed to properly consider A.C.'s views on the termination of mother's parental rights. Mother believes a bonding study was necessary to evaluate the depth of the relationship she shared with A.C. The court denied the request for a bonding study partly due to mother's failure to pursue such a study earlier in the proceedings.

### A.    **Applicable Law**

Bonding studies are considered helpful in some cases, and even indispensable in others, when considering the types of bonds addressed in section 366.26, subdivision (c)(1)(B). (See *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018 [addressing sibling bonds specifically], disapproved on statutory grounds as stated in *In re S.B.* (2009) 46 Cal.4th 529, 537, fn.5.) However, when there is extensive evidence in the record of the relationship between parent and child, a bonding study could be considered unnecessary. "There is no requirement in statutory or case law that a court

9

must secure a bonding study as a condition precedent to" terminating parental rights.  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*).)

It should be noted, in the case of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), our Supreme Court stated in a footnote that "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony."  (*Id*. at p. 633, fn. 4.)  Earlier cases have held, "[t]he applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study."  (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.)  Absent a showing of clear abuse, the exercise of a court's discretion in granting or denying a request for a bonding study will not be overturned.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319; *Lorenzo C.*, at p. 1341.)

Case law has also cautioned that a bonding study pursued late in the process could require a delay in permanency planning, contrary to the goals of the legislative scheme involving dependency.  *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 (*Richard C.*).)  "While it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process."  (*Ibid*.)

**B.    Analysis**

Mother believes a bonding study, prepared by a third party, could have explored A.C.'s actual wishes for a continuing relationship with her mother, which might have impacted the juvenile court's decision on the termination of her parental rights.[7]  To

---

[7]    Arguments made on behalf of mother suggest the evidence in the record provided by and through the department employees was not entirely objective and needed to be countered with evidence from another source.  We note, the purpose of the dependency

support her position, mother cites this court's opinion in *In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591 for the proposition the court was required to consider A.C.'s wishes when deciding whether to terminate parental rights. The court in *Leo M.* considered whether "direct" evidence from a minor was necessary at the section 366.26 permanency planning hearing. This court ultimately concluded there was "reasonable and compelling" inferences that could be drawn from the evidence already in the record on the minor's wishes. (*Leo M.*, at p. 1594.) In her reply brief, mother also cites four cases discussed by respondent to argue that in those cases, the courts emphasized the importance of extrinsic evidence on the issue of a parent/child bond. However, neither *Leo M.* nor any of the four cases cited by respondent reached the conclusion that a bonding study is a necessary part of the analysis, something mother seems to acknowledge. In fact, even the *Caden C.* court stopped short of requiring a bonding study, stating such requests should be seriously considered *where appropriate*. (See *Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.)

Again, the denial of a request for a bonding study is reviewed under an abuse of discretion standard. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.) As noted in *Richard C.*, there are practical reasons for the juvenile court to decline ordering a bonding study, such as those presented when there are last minute efforts to delay decisions on permanent placements, something not encouraged by the statutory scheme. (*Richard C.*, *supra*, 68 Cal.App.4th at p. 1197.)

Mother was arguably on notice in August 2022 that her parental rights could be terminated when she was denied reunification services.[8] The record shows a bonding

_____

process is to protect the child, not to punish the parent. (27A Cal.Jur.3d (2023) Nature of Juvenile Dependency Proceedings, § 5.)

[8]    Again, there is some suggestion in the record mother may have raised the possibility of a bonding study at the August 2022 hearing.

11

study was proposed by mother's attorney in December 2022, when funding for that study was raised as an issue. However, no ruling was asked for or made at that time. The record reveals mother submitted ex parte applications for a bonding study and the necessary funding in early February 2023, which were both denied for lacking a memorandum of points and authorities. The juvenile court then addressed the issue again later in February 2023, in the context of a motion for continuance, noting mother had not moved forward with making a request for a bonding study in any significant way. During a hearing held on March 30, 2023, the court effectively denied a request for a bonding study, citing its belief it would cause an unnecessary delay. The court then reminded counsel for mother that while a study was not being approved, witnesses could be called who had observed the bond between mother and A.C. Finally, another request for a bonding study was made at the time initially set for the contested hearing on May 22, 2023. In response to this final request, the court cited the evidence already available on the issue and concluded, "[I]n order to have an additional expert testify on that subject, it would require a continuance that I believe and I am finding today is contrary to the best interest of the minor."

Based on this record, we cannot conclude the juvenile court abused its discretion and exceeded the " ' "bounds of reason" ' " when denying the request for a bonding study. (See *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.) The denial of this request also did not violate mother's right to due process. (See *Richard C.*, *supra*, 68 Cal.App.4th at p. 1197.)

## II.     The Termination of Mother's Parental Rights

### A.     The Applicable Law and the Standard of Review

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).) At that stage, 'the welfare agency's focus shifts from

12

monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.' (*In re Marilyn H*., at p. 305.)" (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.)

Because the overriding concern is to protect the child, if the designated time period has expired and the efforts to reunify the family have failed, a juvenile court must move toward selecting and implementing a permanent plan for the child under section 366.26. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1008–1009.) However, relevant to the argument presented by mother, section 366.26, subdivision (c)(1)(B)(i) provides an exception "where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 852.) This is often referred to as the beneficial parent-child relationship exception.

The leading authority defining this exception is the opinion in *Caden C.*, which states a parent has the burden to prove by a preponderance of the evidence three elements to justify the application of the beneficial parent-child relationship exception:

(1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633, 636.)

The first element of this test asks the "straightforward" question of whether the parent visited the child consistently and to " 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus of this element is on the best interest of the child as opposed to punishing or rewarding a parent for good behavior in maintaining contact. (*Ibid.*)

The second element of the test asks "whether 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent-child

13

relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

As to the third element, juvenile courts are required to ask "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severing the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) In contrast, an adoptive home might provide a new source of stability that alleviates "emotional instability and preoccupation," making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

Appellate courts review a juvenile court's ruling on the beneficial parent-child relationship exception using a " 'hybrid' " standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) The substantial evidence test applies to the first two elements of regular visitation and the existence of a beneficial parent-child relationship. (*Id*. at pp. 639–640.) The court's decision on whether to terminate parental rights or not to because it would be detrimental to the child, is reviewed for an abuse of discretion. (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently

14

absurd determination.' " ' " (*Id*. at p. 641.) On appeal we " ' "indulge in every presumption to uphold a judgment," ' " as it is the appellant's burden " ' "to affirmatively demonstrate error—it will not be presumed." ' " (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1161 (*A.L.*).)

### B.   Analysis

Our review of the record reveals substantial evidence supports the first two elements of the beneficial parent-child relationship exception in this case. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) As to the first prong of *Caden C.*, the record shows mother had regular visits with A.C., given the circumstances posed and the visitation permitted. We also find substantial evidence supports the second prong that there is a positive relationship between A.C. and mother that could benefit A.C. in the future.

The more difficult resolution, however, concerns the third prong of the *Caden C.* test. When considering this portion of the test, we must consider how A.C. would be affected by the loss of her relationship with her mother, and how not having a consistent relationship with her mother would impact her life in the adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) A juvenile court can rely on the opinions of a social worker, who is an "expert qualified to testify concerning risk assessment and permanent placement issues," when balancing the various factors relevant to the third prong of the *Caden C.* test. (*A.L.*, *supra*, 73 Cal.App.5th at p. 1159.) Again, courts' findings on this prong are not reviewed for substantial evidence, but instead are reviewed for an abuse of discretion. (*Caden C.*, at p. 640.) Using this standard of review, we would have to conclude the court " ' " ' exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.) We cannot reach this conclusion based on the evidence that was before the court.

When discussing this prong, the juvenile court noted the significant time A.C. had spent in the same foster home during her five years, the progress she had made during this most recent placement, and the instability she encountered while in her mother's care. The court acknowledged it considered all the testimony provided in the contested hearing on the permanency plan.[9] The court also noted it reviewed over 140 pages of notes and logs created by the department addressing the period from when A.C. was again placed in the foster home to the point of the hearing. The notes and logs documented, among other things, the visits that occurred between A.C. and her mother. A review of all this evidence reveals the court had access to information on the relationship between A.C. and her mother, as well as the quality of their interactions.[10] We, therefore, cannot conclude the court abused its discretion when considering the third prong of the *Caden C.* test and finding the detriment to A.C. of terminating mother's parental rights did not outweigh the benefits provided by the stability of adoption. Mother failed to meet her "affirmative" burden to prove the beneficial parent-child exception prevented the termination of her parental rights. (See *A.L.*, *supra*, 73 Cal.App.5th at p. 1161.)

## DISPOSITION

The order terminating mother's parental rights is affirmed.

---

[9] The juvenile court even stated it considered the testimony of mother who testified only during the portion of the hearing devoted to her section 388 petition seeking the reinstatement of reunification services.

[10] We reject mother's contention that the juvenile court *improperly* considered her alleged failure to address the "root causes of dependency."

16